IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTER CAPITAL CORP., | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PRA AVIATION, LLC and JOSEPH PACITTI, | : | No. 09-4323 |
| Defendants. | : | |

## MEMORANDUM

Schiller, J.                                                                                               February 4, 2011

Center Capital Corp. ("Center Capital") repossessed and sold a 1987 Gates Learjet 55B in the fall of 2009. The sale satisfied only $1.3 million of Defendants' $3 million debt, and Center Capital sued PRA Aviation ("PRA") and Jospeh Pacitti for breach of contract and breach of guaranty, respectively. Defendants stipulated to liability on these claims, but argue Center Capital's sale of the aircraft was not commercially reasonable. Following a bench trial on January 31, 2011, the Court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. FINDINGS OF FACT

### A. Purchase, Repossession and Sale of the Learjet

PRA borrowed $3 million from Center Capital to purchase a Learjet 55B in July of 2007. (Joint Pretrial Stipulation 2-3.) Center Capital took a security interest in the plane and a guaranty from Joseph Pacitti, a member of PRA. (*Id*. at 1-2.) Defendants defaulted on the loan on April 1, 2009. (*Id*. at 4.) PRA surrendered the aircraft in September of 2009. (*Id*.) Center Capital retained a broker, Business Air International ("Business Air"), to sell the plane. (*Id*.)

Business Air's Managing Director J. Philip Jordan coordinated the sale. Jordan has been involved in ten to fifteen aircraft transactions annually since 1993, including bank sales of repossessed planes. (*See* Def.'s Ex. 5 [Oct. 25, 2010 Opinion of Value] 5.) A former chairman of the National Aircraft Resale Association, Jordan has training in risk management and insurance evaluation in addition to his experience as a broker and consultant. (*Id*.)

Jordan and his staff prepared a report on the market value of the Learjet. (Defs.' Ex. 4 [Business Air Market Evaluation].) The report offers two price ranges: $1 million to $1.2 million for a "quick sale," or $1.3 million to $1.55 million for a sale "with a time period of close to one year" with a more "protracted marketing campaign." (*Id*. at 2.) These price points reflected Jordan's estimate of the plane's value as of October 12, 2009. (*Id*. at 1.)

At trial, Jordan testified that he arrived at these estimates by gathering and reviewing market data, including prices from recent transactions involving a Learjet 55B or similar aircraft. Learjet built eight 55B's, only one of which was sold on the open market in the United States in the year prior to Jordan's report. (*See id*. at 1.) Jordan therefore relied heavily on market data for the Learjet 60, an upgraded model of the 55 series, in determining the 55B's value. (*Id*. at 1.) To attract a buyer to the older 55B, Jordan estimated that a 55B seller would have to offer a price at least $1 million below the price of an early-model Learjet 60. (*Id*. at 1-2.)

Jordan then considered the condition and configuration of the aircraft at issue. PRA's Learjet 55B had a lavatory at the front of the plane, which Jordan considered "a significant obstacle to resale." (*Id*. at 2.) Noting that many buyers "will simply not consider a Lear 55 with a forward lavatory," Jordan deducted $300,000 from the aircraft's value. This figure represented the cost of moving the lavatory to the rear. (*Id*.) Jordan deducted nothing for the plane's

2

mechanical condition or maintenance history, though he did not believe the aircraft's positive attributes in these areas represented any additional value. (*Id.*)

Jordan noted that a Learjet 60 in relatively poor condition had recently sold for $2.75 million, a figure representing the "low end of the Lear 60 market. (*Id.* at 1-2.) Jordan deducted $1 million from this $2.75 million sale due to the Learjet 55B's obsolescence and a further $300,000 for the aircraft's forward lavatory, and arrived at a value estimate of $1.45 million for the 55B. (*Id.*)

At trial, Jordan testified that Business Air marketed the aircraft in a number of trade publications, on the Internet, and through directed advertising to the company's customer list. In keeping with Jordan's marketing strategy, Business Air listed the plane for $1.595 million. (*Id.* at 2; Pl.'s Ex. 7 [Jet Collection Advertisement].) Business Air received a number of inquiries, including three serious offers. On November 4, 2009, aircraft broker Andy Dyer submitted a purchase offer for $1 million. (Pl.'s Ex. 8 [Dyer correspondence dated Nov. 4, 2009].) PRA had retained Dyer to sell the plane prior to its repossession. (*See id.*) Center Capital directed Business Air not to respond to Dyer's offer.

Business Air received two more offers on November 11, 2009. Siegfried Axtmann, the operator of a large Learjet fleet in Germany, offered $1.2 million for an "as is, where is" sale without a pre-buy inspection. (Pl.'s Ex. 9 [Nov. 11, 2009 e-mail from Siegfried Axtmann].) Southeast Turbines Corp. submitted an offer for $1.35 million subject to a pre-purchase inspection. (Pl.'s Ex. 6 [Nov. 11, 2009 Southeast Turbines Offer to Purchase/Letter of Intent].)

On November 19, 2009, Center Capital authorized Business Air to accept $1.3 million for the plane if Southeast Turbines agreed to forego a pre-buy inspection for a "cash deal, as is where

is, kick the tires start the engines" sale. (Defs.' Ex. 6 [Nov. 19, 2009 e-mail from Amy Levy to Oliver Stone].) Jordan testified that this $50,000 discount represented significant potential savings for Center Capital, as a pre-buy inspection would almost certainly reveal over $50,000 in defects which Center Capital would be responsible for fixing before the sale. Southeast Turbines agreed to forego the inspection and purchased the aircraft for $1.3 million on December 7, 2009. (Joint Pretrial Stipulation 5.) Center Capital netted $1.189 million.

### B. Defendants' Evidence

Defendants submitted the following exhibits at trial: the resume, deposition, and expert report of Samuel Tabaei; the Plaintiff's market value report and expert opinion prepared by Jordan; and the e-mail from Center Capital authorizing the $1.3 million "as is where is" sale to Southeast Turbines. Tabaei could not appear at trial due to an overseas commitment with his airline. Defendants therefore requested that the Court consider his deposition.

Tabaei is an aviator who worked for PRA as the 55B's pilot and chief mechanic. (Defs.' Ex. 2 [Tabaei Op. as to Value of Aircraft] 1.) Tabaei estimated the 55B was worth between $2.4 and $2.9 million, basing his opinion on "available commercially acceptable references" and his experience "in flying and maintaining the subject aircraft." (*Id*.) Tabaei did not consider final sale prices for any Learjet 55 in determining the plane's value; he obtained no data for prices actually paid for aircraft between October 12, 2008 and October 12, 2009. (Nov. 23, 2010 Dep. of Samuel Tabaei [Tabaei Dep.] 96, 108, 130.) Rather, Tabaei based his appraisal partially on asking prices. (*Id*. at 152.) Tabaei also testified that his report estimates the aircraft's value as of July 2008. (*Id*. at 75-76.)

Though familiar with — and fond of — the Learjet 55B, Tabaei did not demonstrate

4

familiarity with the aircraft sales business. Tabaei is not a professional aircraft broker or appraiser. He testified that he has conducted between twenty and thirty appraisals in his career and has sold two of his personal aircraft, but has never worked as an aircraft broker or sold planes professionally. (*Id*. at 35-36, 146-47.) The Court thus afforded little weight to Tabaei's testimony regarding the aircraft's value and Business Air's sales practices.

Even Tabaei, however, agreed with Jordan with respect to the prudence of Center Capital's decision to avoid a pre-buy inspection and the deteriorating market for the aging Learjet 55. Tabaei testified that a "decent pre-buy" inspection could cost up to $150,000, with buyers typically obtaining discounts between $50,000 and $150,000 for defects such inspections inevitably reveal. (*Id*. at 39, 153.) He also confirmed that turbine aircraft, including the Learjet 55, have dropped in price since Center Capital sold PRA's 55B. (*Id*. at 131-32.) This is consistent with Jordan's testimony at trial that a Learjet 55 is now worth between $750,000 and $850,000, with the Learjet 55C — a newer, more advanced variant of the 55B — selling for approximately $1.5 million.

## II. CONCLUSIONS OF LAW

The parties agree that Connecticut law applies to this dispute. Connecticut's codification of the Uniform Commercial Code provides that a secured party may sell collateral after default if the sale is commercially reasonable. Conn. Gen. Stat. § 42a-9-610. A sale is commercially reasonable if it is made: (1) in the usual manner or at the price current in any recognized market; or (2) otherwise in conformity with reasonable commercial practices among dealers in the type of property that was the subject of the disposition. *Id*. § 42a-9-627. A number of factors are

5

probative of commercial reasonableness, including the secured party's efforts to contact potential buyers and advertise the sale, the length of time between repossession and sale, the number of bids received, and the price the secured party ultimately obtained. *Conn. Bank & Trust Co. v. Incendy*, 540 A.2d 32, 39 (Conn. 1988). However, the fact that a secured party could have obtained a greater amount, by itself, is not sufficient to deem a sale commercially unreasonable. Conn. Gen. Stat. § 42a-9-627.

The parties do not dispute that Center Capital duly noticed the sale of the aircraft. The burden of proof therefore rests with Defendants to demonstrate that the sale was not commercially reasonable. *See Bank of New York v. Day*, Civ. A. No. 93-68438, 1995 WL 405558, at *2 (Conn. Super. Ct. June 30, 1995). Defendants have not met this burden.

Center Capital demonstrated at trial that the aircraft was sold by a reputable broker in a manner consistent with standard industry practice. Business Air International aggressively marketed the aircraft between September and December of 2009, rejected two low bids, and sold the plane for the best offer it received. Such conduct satisfies the UCC's standard for a commercially reasonable sale. *See Jones v. Bank of Nevada*, 535 P.2d 1279, 1281-82 (Nev. 1975) (affirming holding of commercial reasonableness given secured party's advertising efforts, rejection of low bids, and sale to highest bidder).

## III. CONCLUSION

Defendants failed to show that Center Capital's sale of its repossessed aircraft was not commercially reasonable. The Court will therefore enter judgment in favor of Center Capital in accordance with this Memorandum.